In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3227

JIM LOWERY,

Petitioner-Appellant,

v.

RONDLE ANDERSON, Superintendent,
Indiana State Prison,

Respondent-Appellee.


Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 96-0071-C-H/G--David F. Hamilton, Judge.


Argued June 28, 2000--Decided August 29, 2000



Before Flaum, Chief Judge, Bauer and Manion, Circuit
Judges.

Bauer, Circuit Judge.  Jim Lowery is under
sentence of death for the 1979 murders of Mark
and Gertrude Thompson. A direct appeal to the
Supreme Court of Indiana won him a new trial, but
upon retrial he was again convicted and again
sentenced to death. His appeals thereafter were
fruitless. He petitioned for collateral relief,
but his challenges to the murder convictions and
death sentence were unsuccessful. His attempt to
win a writ of habeas corpus from the U.S.
District Court also failed. Now he is before us.
We find that neither his conviction nor his
sentence were the result of constitutional
violations and affirm the District Court's
decision to deny the writ.

I.  BACKGROUND

Mark and Gertrude Thompson were murdered in
their home on the night of September 30, 1979 by
a man they once trusted as their caretaker. The
Thompsons were an elderly couple and their
declining health necessitated that they hire
others to help care for them and their property.
During the summer of 1979, Lowery and his wife
Barbara filled that role.

Only a few months before the murders, Mark
Thompson fired Jim Lowery and ordered him off the

Thompson property. The loss of that job included the loss of the rent-free caretaker's trailer on the Thompson property, in which Lowery and his family lived, and the loss of the modest salary. At first, Lowery refused to accept his demise, pleading with Mark Thompson that he had no money and no place to go. Thompson, however, was so dissatisfied with the Lowerys' service that he offered Lowery $100.00 if he would leave the property immediately. Lowery took the money and moved his family to an old school bus in a nearby campground.

On September 30, 1979, Lowery and his friend Jim Bennett drove to the Thompson's home intending to rob and murder the couple. Several weeks before, Lowery and Bennett had discussed committing a crime for pecuniary gain, as both were in need of money. Lowery told Bennett he knew where he could get some money, but it was not until they were in the car on their way to the Thompson's house that Lowery told Bennett that they were going to rob the Thompsons. Lowery's plan was to force Mark Thompson to write a check for $9,000 and then to kill and bury the couple. Lowery was armed with a pistol and Bennett a sawed-off shotgun.

Lowery and Bennett arrived at the Thompson's property around dark. Janet Brown, the new caretaker, was in the trailer reading a book when she heard the Thompson's dog bark. Seconds later, the trailer door was kicked in and an armed Lowery entered, leaving Bennett outside.

Ms. Brown later told police that she immediately recognized the man as the Thompson's former caretaker. The two had met at the post office a week earlier and had struck up a conversation. When she told Lowery that she worked for the Thompsons, Lowery admitted that he had been their previous caretaker and he spoke, she thought, hatefully of them.

Lowery put the pistol against Brown's neck and forced her to take him into the Thompson's house. Bennett joined them as they crossed the lawn to the house. Inside, they found Mark Thompson standing in the kitchen. Immediately upon seeing Lowery and being told that this was a "hold up," Thompson said "You don't want to do this now, Jim." Lowery responded by shooting him in the stomach.

After shooting Mark Thompson, Lowery forced Brown, with the gun to her head, through the kitchen, down the hall, and into the den where Gertrude Thompson was watching television. Lowery ordered Mrs. Thompson to get up and to go into the kitchen. She complied. As she was walking

down the hall, Lowery hit her in the head with the gun. She began to bleed, but was able to make it into the kitchen, where Lowery shot her once in the head at close range. Gertrude Thompson died before help could arrive.

Lowery also shot Janet Brown, but because she put her hands in front of her, the shot was deflected and she was grazed but alive. She wisely lay on the floor pretending to be dead. As she lay there, she heard the burglar alarm sound. Somehow, despite his wound, Mark Thompson had activated it, obviously greatly distressing Lowery and Bennett. Lowery went back to where Mark Thompson was, and Brown heard two more shots. Lowery and Bennett then fled.

Later, when she was certain the two men were gone, Brown called the police. When they arrived, Gertrude Thompson was dead and Mark Thompson was dying from a gunshot wound to the head. Before his death, Mark Thompson was able only to say that four "monkeys" assaulted him. His son testified that Mr. Thompson used the term "monkeys" when he could not remember someone's name.

Using the back roads, Lowery and Bennett returned to the old school bus. They told Lowery's wife, Barbara, about the shootings. Lowery was arrested two days later. Bennett the day after that. After his arrest, Lowery made several incriminating statements to police officers. He also told his cellmate of his crimes, describing them in a detailed manner. Before trial he challenged the admissibility of these statements, but was successful in excluding only some.

The prosecution struck a deal with Bennett. In exchange for his testimony against Lowery and a plea of guilty, the State dropped the habitual offender charge against Bennett and its request for the death penalty. It also guaranteed Bennett a sentence of 40 years.

Bennett testified that he and Lowery had planned to rob the Thompsons and that Lowery shot the Thompsons and Ms. Brown during the attempted burglary. Brown identified Lowery in court and testified that he was the person who shot her and the Thompsons. Barbara Lowery also testified, recounting how her husband and Bennett left the camp with a handgun and a shotgun, saying they were "off on a caper." When they returned later that night, she said, they were visibly upset and shaking, with Bennett explaining that it "went bad," and, in Lowery's presence, saying "he" (meaning Lowery) shot them in the head. The jury convicted Lowery of two counts of murder and one

count of attempted murder and recommended that he be put to death. The judge sentenced him to death. The Supreme Court of Indiana reversed Lowery's convictions on direct appeal because the trial court failed to sequester the jury. Lowery v. State, 434 N.E.2d 868 (Ind. 1982). Lowery was tried a second time.

Bennett refused to testify at the second trial. He wanted a "better deal" on his plea bargain. The State refused. Bennett was brought before the court (out of the jury's presence) and refused to be sworn in. The court threatened to hold Bennett in contempt, but Bennett still refused to testify. He was held in contempt. The next day, this procedure was repeated and the same result obtained. Frustrated, the trial judge told Bennett that if he continued to refuse to testify, the court would order the prosecutor to bring murder charges against Bennett because he had violated his plea agreement. Both the prosecutor and the defense counsel agreed that such an order was beyond the scope of the court's authority and the court recanted. Before Bennett was aware that the threat of prosecution had been removed, however, he changed his mind and agreed to testify. That change was short lived. Once Bennett was advised that the only penalty for refusing to testify was to be held in contempt of court, he again refused to testify. The court then declared Bennett to be unavailable and allowed the prosecutor to read Bennett's testimony from the first trial to the jury. The jury convicted Lowery of the murders of Mark and Gertrude Thompson and the attempted murder of Janet Brown.

At the sentencing phase of the trial, the prosecution argued for the death penalty, saying it was justified because the murders were committed during an attempted burglary (an aggravating factor) and because there were multiple murders. Lowery's mother, father and youngest sibling testified on Lowery's behalf, as did a psychiatrist retained by the defense. Lowery also took the stand, admitting to the crimes. Nevertheless, the jury recommended the death penalty. The trial judge sentenced Lowery accordingly.

The Supreme Court of Indiana affirmed the murder convictions and death sentences. Lowery v. State, 478 N.E.2d 1214 (Ind. 1985). However, it later reversed the conviction of attempted murder, saying the jury had been wrongly instructed on that count. Lowery v. State, 640 N.E.2d 1031 (Ind. 1994). The State chose not to retry Lowery for the attempted murder. The U.S. District Court denied habeas relief. Lowery v. Anderson, 69 F.Supp.2d 1078 (S.D.Ind. 1999). Lowery appeals, claiming that the introduction of

Bennett's prior testimony violated his Sixth and Fourteenth Amendment rights, that the State and trial court violated Caldwell v. Mississippi, 472 U.S. 320 (1985), by leading the jury to believe that its recommendation to the judge concerning the death penalty carried less weight than in fact it does, and that he was denied effective assistance of counsel. We affirm.

## II.  DISCUSSION

Federal courts may grant a writ of habeas corpus when a person is held in custody under a state court judgment in violation of the United States Constitution. 28 U.S.C. sec.2254; Kavanagh v. Berge, 73 F.3d 733, 735 (7th Cir. 1996). Because Lowery filed his petition before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, our review is plenary. Lindh v. Murphy, 96 F.3d 856 (7th Cir. 1996) (en banc) rev'd on other grounds 521 U.S. 320 (1997). We must accept as true the reasonable factual findings of the state courts, Abrams v. Barnett, 121 F.3d 1036, 1038 (7th Cir. 1997), but questions of law or mixed questions of law and fact are considered de novo. Brewer v. Aiken, 935 F.2d 850, 855 (7th Cir. 1991). Furthermore, we may consider our own jurisprudence, in addition to the jurisprudence of the United States Supreme Court. Abrams, 121 F.3d at 1037-38.

### A.  Admission Of Bennett's Prior Testimony

At Lowery's first trial, Jim Bennett testified for the prosecution. He did so pursuant to a plea agreement that required his testimony and guaranteed him a sentence of 40 years. Before the retrial, Bennett informed the prosecutor that he would not testify again unless the prosecutor reduced his sentence to 10 years. The prosecutor refused. Bennett, then, true to his word, refused to testify when called. The trial judge held Bennett in contempt, but Bennett still refused to testify. As described below, this procedure was repeated several times, outside the jury's presence. Finally, Bennett was called with the jury present. He refused again to testify and was again held in contempt. At that point, the trial judge declared Bennett to be an unavailable witness and allowed the prosecutor, over Lowery's objection, to read to the jury Bennett's testimony from the first trial. Lowery claims this was reversible error because it denied him his constitutional right to confront and cross-examine the witness against him. He also argues that Bennett was not truly "unavailable" because the State failed to exhaust other means which might have induced Bennett to testify.

The Confrontation Clause of the Sixth Amendment

guarantees the right of the accused to "be confronted with the witnesses against him." U.S. Const. Amendment VI. See also Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986). The main and essential purpose of confrontation is to secure for the opponent the opportunity for cross-examination. United States v. Sasson, 62 F.3d 874, 882 (7th Cir. 1995), cert. den'd, 516 U.S. 1131 (1996). Lowery contends that he was deprived of this right when Bennett's prior testimony was read to the jury.

The Sixth Amendment confrontation clause, however, "permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial." Maryland v. Craig, 497 U.S. 836, 847-48 (1990) (citations omitted). The confrontation clause is satisfied, and no constitutional violation occurs, when the defendant had a full and fair opportunity to cross-examine the witness at the earlier proceeding and the witness is "unavailable" for the subsequent proceeding. Mancusi v. Stubbs, 408 U.S. 204, 216 (1972). Lowery admits that Bennett's testimony was subject to cross-examination at the first trial and does not contend that the cross-examination was less than full or meaningful. He complains that Bennett's prior testimony was improperly admitted because Bennett was not truly "unavailable" the second time around.

It is well established that a witness may be deemed "unavailable" and use of his former testimony permitted if the witness "persists in refusing to testify . . . despite an order of the court to do so." Fed.R.Evid. 804(a)(2). See also California v. Green, 399 U.S. 149, 168-69 (1970). However, there is more to consider. The prosecution must also demonstrate that it made a good faith effort to obtain the witness' testimony, in person, before the trier of fact. Ohio v. Roberts, 448 U.S. 56, 74 (1980). The lengths to which the prosecution must go to produce a witness is a question of reasonableness. Id.

Here, in an effort to secure Bennett's testimony for the second trial, the prosecutor had Bennett transported from the state prison in which he was incarcerated to a county jail so that he could be available to testify. He also attempted to talk with Bennett before calling him as a witness, and kept calling him as a witness during the trial, even though Bennett refused to testify and had been held in contempt of court. What the prosecution did not do was, as the trial judge suggested, threaten to revoke Bennett's plea agreement and try him for murder, or

threaten to try him for obstruction of justice. The Supreme Court of Indiana found that Bennett "was amenable" to these tactics and Lowery suggests that because they might have worked, the State did not act reasonably or in good faith in attempting to obtain Bennett's testimony for the retrial. The District Court disagreed, saying:

[t]he fact that other steps the prosecution did not take might also have been reasonable does not show either that it failed to make a reasonable, good faith effort to secure Bennett's testimony, or that Lowery's Sixth Amendment rights were violated by use of Bennett's testimony from Lowery's first trial.

Lowery, 69 F.Supp.2d at 1093. We agree. Although the record is silent as to why the prosecution chose not to threaten Bennett with further prosecution or charge him with a crime, there is no requirement that it do so and such decisions are well within the prosecution's discretion. Johnson v. State, 675 N.E.2d 678, 683 (Ind. 1996); LaMotte v. State, 495 N.E.2d 729, 733 (Ind. 1986). We decline to impose a rule imposing the court's will upon the prosecution and we fear that to do so would violate the separation of powers.

The fact that more, theoretically, could have been done to persuade Bennett to testify does not persuade us to reach a contrary result. If we adopt Lowery's position and mandate that the prosecution threaten recalcitrant witnesses, or possibly even charge them with minor crimes, where do we stop? A bright line test is not possible in cases such as this. We believe the better rule is to consider the totality of the circumstances and determine reasonableness and good faith on a case by case basis. In this case we find that the prosecution did make a good faith effort to secure Bennett's testimony for the retrial.

We understand the passion with which Lowery presents his argument, especially in light of the inconsistent statements Bennett made between the first and second trials. During that interim, Bennett wrote letters to state officials and to Lowery, saying in one that there were three people involved in the crime and, in another, that Lowery was not present when the crime occurred. In each instance, he offered to exchange information for a further reduction in his sentence./1 Lowery argues that he was irrevocably prejudiced by the prosecution's failure to procure Bennett as a live witness so that he could cross-examine him with this new information. He asks that we review this claim under the harmless error standard of Chapman v.

California, 386 U.S. 18 (1967), and says that once we do reversal is mandated.

Under the Chapman harmless error standard, the government has the burden of demonstrating that the error was harmless beyond a reasonable doubt. Id. at 22. We have reviewed and rejected that argument and instead adopted the standard set forth by the Supreme Court in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which holds that an error is harmless unless the defendant can show that it had a "substantial and injurious effect or influence in determining the jury's verdict." Tyson v. Trigg, 50 F.3d 436, 446-47 (7th Cir. 1995), cert. den'd, 516 U.S. 1041 (1996). See also Fleenor v. Anderson, 171 F.3d 1096, 1101 (7th Cir. 1999), cert. den'd, 120 S.Ct. 215 (1999) (applying the Brecht standard in a capital case). The Brecht standard recognizes that an earlier court has already reviewed the claimed error under the heightened Chapman standard and, therefore, permits a lower level of scrutiny on appeal. Here, the "new evidence" upon which Lowery relies developed before the second trial. His claims thereafter could have been reviewed by the Supreme Court of Indiana on direct appeal and on petition for collateral relief or by the U.S. District Court on the petition for writ of habeas corpus. They were not, however, because the letters and testimony regarding Bennett's alleged recantation were not offered at trial. The Supreme Court of Indiana, in refusing to review the alleged error said "the court did not have an opportunity to rule on the offer of the letter, and there is no error presented for our review." Lowery, 478 N.E.2d at 1223-24 (Ind. 1985). Thus, contrary to Lowery's assertion, we believe that the courts before us have had an opportunity to address the claimed error and have rejected it, finding that it was either waived or did not present an issue of manifest injustice requiring the reversal of his conviction. We therefore believe the rationale behind Brecht has been satisfied and apply its standard of review to this case.

We find that Lowery has not met that burden. The trial court indicated that Lowery could inform the jury about Bennett's letter and statements, but Lowery's attorney never attempted to do so. Lowery, 478 N.E.2d at 1223. Furthermore, the jury was informed that Bennett was testifying pursuant to a plea agreement which, as the State points out, could make the jury skeptical of his testimony anyway. But most importantly, we believe that Lowery fails to meet his burden of proving that the claimed error had a "substantial and injurious effect or influence in determining the jury's verdict" because of the wealth of corroborative information presented by

the prosecution. Not only did Bennett testify that it was Lowery who shot the Thompsons and Ms. Brown, Lowery himself confessed those facts to various police officers and his cellmate and those statements were presented to the jury. Ms. Brown also testified and identified Lowery as her attacker and as the murderer of the Thompsons. And, finally, there was the testimony of Lowery's ex-wife, Barbara. Our review of the entire record in this case convinces us that any error (and we believe there was none) in the admission of Bennett's prior testimony was harmless.

### B. Role Of The Jury's Recommendation Of Death

A death sentence may not be based on "a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985). Lowery complains that he was denied due process and a fair sentencing determination because the court and prosecutor "demeaned" the jury's sense of responsibility in a "materially inaccurate and misleading manner" that violated Caldwell. The court told the jury during voir dire that "it's not the function of the jury to sentence a defendant. It is solely the responsibility of the Judge, me, and the Judge must make the final decision. The jury's decision is merely a recommendation." The prosecutor spoke likewise.

In Caldwell, the prosecutor, apparently hoping to sway timid jurors, argued to the jury that if it decided to impose the death penalty, its decision would not be the "final decision," and that its decision was "automatically reviewable" by the state's supreme court. The Supreme Court held that these comments were inappropriate and required reversal because the suggestion that "the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." Id. at 333. Any decision based upon a jury's inaccurate perception about its role in the imposition of a death sentence is, under the reasoning of Caldwell, unconstitutional. Lowery argues to us that the court's and prosecutor's statements were inaccurate and require reversal of his sentence because they minimized the jury's role and made the juror's believe their role in imposing a death sentence was almost ceremonial. We do not agree.

To violate Caldwell, the remarks to the jury must inaccurately describe the role of the jury under state law. Romano v. Oklahoma, 512 U.S. 1,

9 (1994); Dugger v. Adams, 489 U.S. 401, 401 (1989); Darden v. Wainwright, 477 U.S. 168, 183-84 n.15 (1986). Under Indiana law, the jury recommends to the judge whether the death penalty should be imposed. The judge must consider the jury's recommendation, but, the final decision is his. Ind. Code sec.35-50-2-9(e). In this case, the jury was informed that its role was to recommend to the trial judge whether or not to impose the death penalty. Contrary to Lowery's suggestion, the jury was properly instructed as to its role and there was no Caldwell violation.

We recently addressed, in Fleenor v. Anderson, 171 F.3d 1096, 1099-101 (7th Cir. 1999), cert. den'd, 120 S.Ct. 215 (1999), the application of Caldwell to the jury recommendation procedure in Indiana. There, the jury was repeatedly informed that its role in sentencing was to make a recommendation to the trial judge, who would make the final sentencing decision. The judge advised the jury during voir dire:

In Indiana, after the trial of a case, if a defendant is found guilty, then another hearing is held before the jury, where the parties have an opportunity to present . . . evidence of aggravating and mitigating circumstances in the case and then the jury again retires to make a recommendation to the court from the jury whether they recommend the death penalty. It's not the function of a jury to sentence a defendant. It is solely the responsibility of the Judge, me, and the Judge must make the final decision. The jury's opinion is merely a recommendation to me.

Lowery, 69 F.Supp.2d at 1101, citing state court record, exhibit 28 at page 48. These words mirror, almost exactly, the words given to Lowery's jury. We found in Fleenor, and we find here, that telling the jury that its role is advisory and that the court makes the final sentencing determination does not violate Caldwell. As we said in Fleenor, "what the judge was telling the jurors was true, and it was also something they were entitled to know." Id. There being no affirmative misstatement of law or fact that could mislead the jury, we find that there was no violation of Lowery's rights.


C.   Ineffective Assistance Of Counsel

The Sixth Amendment protects a defendant's right to a fair trial by providing him with a right to counsel. Strickland v. Washington, 466 U.S. 668, 684 (1984). This right is satisfied as long as counsel's conduct at trial was competent. This right is violated when counsel's conduct was so deficient as to render the trial meaningless or

its result unreliable. Id. at 686. Lowery claims his trial counsel was so ineffective as to meet this standard.

To prevail on a claim of ineffective assistance of counsel, Lowery must prove: (1) counsel's representation was deficient, and (2) the deficient performance so prejudiced him as to deprive him of a fair trial. Id. at 687-88. The absence of either prong defeats his claim. Id. at 700. Our review is highly deferential, id. at 689, and we will indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Galowski v. Berge, 78 F.3d 1176, 1180 (7th Cir. 1996), cert. den'd, 519 U.S. 878 (1996) (citations omitted). Indeed, we will reverse only when it has been shown with a reasonable probability "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id.

Lowery argues that his trial counsel provided ineffective assistance by (1) failing to introduce evidence of Ms. Brown's prior misidentification of him at the first trial, where she identified a picture of Bennett as a picture of him, (2) failing to introduce additional evidence impeaching Bennett; and (3) failing to investigate and present additional mitigating evidence during the sentencing phase of the trial. Like the District Court, we quickly dismiss Lowery's challenge to his attorney's failure to impeach Brown with the mistaken identification.

In Lowery's first trial, defense counsel showed Janet Brown a photograph of Bennett and asked whether the person in the photo was the person who shot her. Brown said "[i]t's not a very good picture. It looks like James Lowery's eyes, but it's not a very good picture of him." Counsel did not repeat the exercise or raise the prior misidentification in the second trial. Claiming that this omission was a constitutional violation, Lowery asks us to reverse his conviction.

We will not second guess a trial counsel's strategic or tactical decisions. United States v. Godwin, 202 F.3d 969, 973 (7th Cir. 2000), cert. den'd, 120 S.Ct. 2023 (2000). At a post-conviction hearing, counsel testified that he did not introduce this evidence because he considered it a "lucky fluke" and was concerned that the jury might have regarded the use of a poor quality photograph as an attempt to trick Ms. Brown. It also, he said, would have gone against his trial strategy of making no reference to Lowery's prior trial and conviction. This is

likely because the court had granted a defense motion in limine to exclude any reference to the previous trial. The District Court found that this omission was a strategic decision and did not rise to the level of ineffective assistance of counsel. We agree. Counsel can fairly have been said to have been exercising trial strategy and tactics in deciding not to challenge Brown's credibility in this manner.

Lowery also argues that his attorney was ineffective because he failed to offer Bennett's letters and other inconsistent statements during the second trial. He believes this evidence would have further impeached Bennett's credibility. The State argues that counsel's failure did not prejudice Lowery.

Our inquiry into whether Lowery was prejudiced by his counsel's omission, under Strickland, focuses on whether the claimed deficiency rendered the proceeding unreliable or unfair. Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). As the District Court noted, the jury was already skeptical of Bennett. They were aware of the existence of the plea agreement whereby he was trading his testimony in exchange for leniency, and they saw him refuse to testify and saw the judge hold him in contempt. It is hard to imagine that the jury could have held Bennett in high regard after all of that. Therefore, it can be supposed that his credibility had already been damaged in the eyes of the jury. The additional evidence probably would have had little additional impact on that front.

Furthermore, as the District Court also discussed, "Bennett's testimony on the critical points was corroborated." Lowery's ex-wife Barbara testified to her observations and to the statements made to her by both Lowery and Bennett. There was also the testimony of Janet Brown, an innocent victim who was at the wrong place at the wrong time. Her testimony was virtually unchallenged and powerful. It was also consistent with and in addition to Bennett's testimony. Finally, there were the admissions made by Lowery to various police officers and to his cellmate. Viewed in the totality of these circumstances, we believe that the admission of this extra evidence to impeach Bennett would not have changed the jury's verdict. The omission did not, then, render the trial unfair or unreliable.

Lowery challenges the District Court's reliance on his penalty phase testimony to conclude that trial counsel's failure to offer Bennett's letters and statements did not prejudice him. The District Court said that the trial result could not be doubted as Lowery admitted on cross-

examination that he murdered the Thompsons. He fears that the court's analysis renders the Strickland prejudice prong outcome determinative and puts defendants in a no-win situation if they choose to confess at the penalty phase in hopes of receiving a more lenient sentence. He correctly argues that if that were the standard, no defendant would ever confess because he could not later challenge any errors on appeal. Although this argument contains some logic, it is inapplicable here. The District Court did not base its finding of no-prejudice on Lowery's penalty phase testimony alone. As discussed above, it found a wealth of other corroborative testimony that supported the jury's verdict. For this reason, we reject Lowery's argument and affirm the District Court's finding that he was not prejudiced by his trial counsel's failure to introduce Bennett's letters and statements.

Finally, we turn to Lowery's contention that his counsel was ineffective because he failed to introduce additional mitigating evidence at the sentencing phase of the trial. He wishes that his lawyer had presented more biographical and character evidence. The Supreme Court of Indiana found that the desired evidence would have mirrored evidence presented and been cumulative. Lowery, 640 N.E.2d at 1048. This is true. Lowery's mother, father, and brother testified that he had a rough childhood. A psychiatrist testified to his previous bouts of mental illness. The additional evidence that he wished to present was of the same nature. It was testimony by his younger siblings that he was kind to children and that he showed kindness to them while growing up. This proffered testimony, as the courts before us found, would not have added much and would have been largely repetitive. Although we understand Lowery's wish to present as much evidence as possible to humanize him to the jury and avoid the death penalty, we cannot say that his trial counsel's failure to offer this evidence was a violation of his constitutional rights.

III.  CONCLUSION

For the foregoing reasons, the judgment of the District Court is affirmed.

AFFIRMED.

/1 He also reportedly told prison officials that he was high on drugs at the time of the crime and that he was going to "fuck up" the second trial by saying that Lowery wasn't there.