NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 23, 2008
Decided May 12, 2008

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

JOHN L. COFFEY, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 07-2412

| | |
|---|---|
| PAUL MAGEE,<br>    *Petitioner-Appellant,*<br><br>    *v.*<br><br>UNITED STATES OF AMERICA,<br>    *Respondent-Appellee.* | Appeal from the United States District<br>Court for the Northern District of<br>Indiana, South Bend Division.<br><br>No. 3:04-CV-404RM<br><br>Robert L. Miller, Jr.,<br>*Chief Judge*. |

**O R D E R**

A federal jury in Indiana found Paul Magee guilty of committing two bank robberies. Magee moved for a new trial on the basis of newly discovered evidence, and the district court denied the motion. After losing his direct appeal, *United States v. Magee*, 66 Fed. App'x 71 (7th Cir. 2003), Magee filed a motion under 28 U.S.C. § 2255, arguing that his trial counsel had been ineffective by, among other things, failing to interview three potential witnesses. The district court denied the motion after holding a hearing, but it issued a certificate of appealability. On appeal, Magee continues to argue that his trial counsel acted unreasonably when he did not interview these potential witnesses whose testimony could have been used to impeach the credibility of one of the government's star witnesses.

Because we conclude that Magee's counsel acted reasonably and that his performance did not prejudice Magee, we affirm.

Magee was charged with three separate bank robberies that occurred in 2001—one in February, one in March,[*] and one in April—in violation of 18 U.S.C. § 2213(a) and (b).  Two of his co-defendants, Dion Freeman and Charles Spires, pleaded guilty to participating in the February robbery.  As part of their plea agreements, Freeman and Spires agreed to testify for the government at Magee's trial.

The following evidence was presented at trial.  Freeman testified that Magee was his crack dealer and routinely supplied him with crack for personal use.  Generally, Freeman would pay Magee in cash when the crack was delivered, but in the fall of 2000, Magee allowed Freeman to purchase $100 worth of crack on credit.  This proved to be a grave error for both Magee and Freeman.  Freeman failed to pay; so, according to Freeman, Magee and one of his associates, Chapeaka Mack, approached Freeman and told him to pay up "or else."  A week later a man Freeman knew as Jeremiah demanded payment of the debt.  When Freeman said he did not have the money, Jeremiah brandished a gun and told Freeman he "better get the money, or else I am gonna kill you."  Freeman testified that on October 26 three men drove up to his apartment building and shot him after a short chase.  Although Freeman did not immediately recognize the men, once they emerged from the car and shot him he recognized them as Magee, Mack, and Jeremiah.  Freeman admitted on cross-examination, however, that immediately after he was shot, he told the police that Jeremiah was the shooter, but did not mention the others.

Freeman testified that he believed the shooting settled his debt to Magee, but apparently Magee did not see it that way.  More than three months later, in February 2001, Magee and Spires, another of Magee's cohorts, began planning a bank robbery.  According to Spires, Magee said that a "crackhead" owed him money and suggested they recruit him to participate.  Magee also mentioned that "somebody" had shot this "crackhead" in retaliation for hitting him with a "bottle or pipe."  The next day, the pair went to Freeman's apartment and, according to Freeman, Magee told him that he had to settle the debt and to "get his money" by robbing a bank.  Freeman reluctantly agreed, and according to Freeman and Spires, the three men went to a federal credit union where Magee gave Freeman a gun, a note, and some plastic bags for the loot.  According to both witnesses Freeman went into the credit union, but got cold feet and left.  Magee yelled at Freeman,  and so he returned to the credit union and robbed it of $5,670, giving the money and gun back to Magee.

---

[*]A jury acquitted Magee of the March robbery and the facts of that robbery have no bearing on Magee's § 2255 motion.

Freeman also testified about the April robbery. According to Freeman, Magee, this time with Mack, once again found him and told him that his debt still was not paid and that to discharge it he had to rob another bank. Freeman testified that Magee threatened to kill his girlfriend if he refused. Magee gave Freeman an unloaded gun and told him to get "his money." Freeman robbed the bank of approximately $10,000. A witness testified that he spotted Freeman leaving with two other men in the getaway car. A police officer started following the robbers, Freeman testified, thus Magee threw the gun out of the car window. When they were near their destination, Mack lost control of the car, and Magee and Freeman jumped out and fled on foot, but the police eventually caught up with and arrested Mack.

Spires was not involved in the April robbery but he nonetheless corroborated parts of Freeman's account. According to Spires, he was with a friend on the day of the robbery when Magee called and asked to be picked up. Magee told Spires that he, Mack, and Freeman had robbed a bank, that they were chased by the police, and that Mack had been caught. Magee asked Spires to help him look for money he said he had tossed out of the getaway car while he was fleeing from the police. Although they searched for the money, they did not find it.

On cross-examination Magee's attorney impeached Freeman with a statement he had given to police when he was arrested in which he said that he had not participated in any crimes other than the April robbery, omitting his involvement in the February robbery. Freeman also admitted that immediately after the October 2000 shooting he told police that Jeremiah—not Magee—had shot him. Furthermore, Magee's attorney elicited testimony from Freeman about his history of purchasing and using crack, his membership in a gang, his prior jail sentences, his plea agreement covering the robberies, and his role in the robberies.

Magee testified in his own defense. He denied shooting Freeman and said that he believed that Jeremiah shot Freeman because Freeman had "bust[ed]" Jeremiah in the head. He denied involvement in any of the robberies, asserting that Freeman, Spires, and other witnesses had lied.

The jury convicted Magee of the February and April robberies. Magee's attorney, Michael Rehak, believed that Freeman had lied on the stand and so he hired an investigator to look into Freeman's story. The investigation turned up, among other things, three witnesses—Tabitha Isabell, Dennis Ryan, and Clarence Pointer—who provided sworn declarations that Magee was not involved in Freeman's shooting. Armed with the fruits of the investigation, Magee unsuccessfully moved for a new trial, arguing that this newly

discovered evidence would have helped to impeach Freeman's credibility. In affirming, we concluded that the district court did not err in crediting Freeman's testimony about the shooting despite the new evidence and that, in any event, Freeman's testimony about the robberies was corroborated by other evidence. *United States v. Magee*, 66 Fed. App'x 71 (7th Cir. 2003).

Magee then filed a motion under 18 U.S.C. § 2255, claiming he received ineffective assistance of counsel. He listed ten alleged errors Rehak made, but pursues only one on appeal. Magee asserted that, before trial, he told Rehak about the three potential witnesses who he said would testify that Magee was not involved in Freeman's shooting, but that Rehak failed contact them until after trial. Magee attached to his motion their sworn declarations. Isabell stated that Freeman told her the name of the person who shot him and, although she could not remember the name, she knew it was not Magee. Ryan averred that he was with Magee when Freeman was shot. Pointer said that he saw two men confront and chase Freeman on the day of the shooting, and that neither man was Magee.

The district court held an evidentiary hearing. At the hearing Magee testified that before the trial he told Rehak about Isabell, Ryan, and Pointer and that he thought they were important witnesses because their testimony could "attack [Freeman's] credibility." Magee said he told Rehak that his brother would try to locate the witnesses and would make sure that they called Rehak. Only one of the potential witnesses, Pointer, testified at the hearing. He testified that he had no information on the bank robberies, and that he did not witness the shooting, but that he saw Freeman arguing with two men in a liquor store just before the shooting and that Magee was not there.

Rehak also testified at the hearing. He said that he met with Magee nine times while preparing for trial. He testified that, before trial, Magee told him that Isabell and Ryan could corroborate Magee's testimony about the shooting, but that Magee did not know where to find them. Rehak confirmed that Magee told him his brother would find them, but the brother never contacted Rehak, and Rehak did not speak to any of the three witnesses. Although Isabell called Rehak once, she did not leave a phone number where she could be reached. Rehak said that he did not search out Isabell and Ryan because he did not know where to find them and because he thought that he had enough evidence to impeach Freeman. He testified that he did not learn about Pointer until the investigator found him after the trial.

The district court denied Magee's motion, finding that Rehak had not been ineffective in failing to interview these witnesses because Rehak's investigation and litigation strategies were reasonable and did not prejudice Magee. The district court then issued a certificate of appealability.

Magee asks us to conclude that Rehak's decision not to interview Isabell, Ryan, and Pointer rendered his performance so deficient as to deny Magee his Sixth Amendment right to counsel. To establish that his attorney was constitutionally ineffective, Magee must prove both that his attorney's performance fell below an objective standard of reasonableness and that counsel's errors prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Suggs v. United States*, 513 F.3d 675, 678 (7th Cir. 2008). We review de novo the district court's determination that Rehak's performance met constitutional muster. *See Suggs*, 513 F.3d at 678. In assessing counsel's performance, we start with "a strong presumption in favor of adequate assistance, then determine whether [counsel's] acts or omissions fall outside the wide range of professionally competent assistance." *Rutledge v. United States*, 230 F.3d 1041, 1049 (7th Cir. 2000)*; see Strickland*, 466 U.S. at 689. We do not look at counsel's purported errors in isolation, but rather we evaluate counsel's performance as a whole to determine whether it was adequate. *See Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986); *Badelle v. Correll*, 452 F.3d 648, 662 (7th Cir. 2006).

Magee's failure to interview these three witnesses does not constitute deficient performance. An attorney is obligated to undertake a reasonable investigation of the facts of the defendant's case, and this includes interviewing witnesses. *See Rutledge*, 230 F.3d 1049-50. Counsel's failure to interview witnesses can constitute incompetent representation in some cases, such as when the witness could provide an alibi for the defendant. *See id*. at 1049-50; *Washington v. Smith*, 219 F.3d 620, 629-32 (7th Cir. 2000). In other circumstances, however, it is acceptable for an attorney to forgo an investigation, particularly when the lawyer makes "a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

At the evidentiary hearing Rehak provided two reasons for his failure to interview Isabell and Ryan (he testified that he did not learn about Pointer until after trial). First, he said that he did not know where to find them because they recently had moved and that, in any event, Magee's brother was supposed to track them down. But this excuse does not show that Rehak made a reasonable decision. It is the obligation of counsel, not the defendant, to investigate the case and to find witnesses. *See Washington*, 219 F.3d at 631. Magee's brother's offer to assist Rehak did not absolve Rehak of his duty to investigate. And although Rehak contends that he did not know where to start looking for Isabell and Ryan, an investigator had no trouble tracking them down after trial.

More compelling is Rehak's explanation that he decided that he did not need to interview them because he already had enough evidence to impeach Freeman. When counsel already knows what a potential witness is going to say and makes a strategic decision not to pursue the testimony, counsel's performance is not defective. *See Rutledge*,

230 F.3d 1051; *United States v. Jackson*, 935 F.2d 832, 846 (7th Cir. 1991); *United States v. Curtis*, 742 F.2d 1070, 1075 (7th Cir. 1984). Rehak already knew the information Isabell and Ryan would provide because Magee had told Rehak that they would corroborate his testimony that he was not involved in Freeman's shooting. Rehak decided not to pursue their testimony because he intended to—and did—call into question Freeman's version of the shooting by cross-examining him on his statement to police that Jeremiah had shot him and by eliciting testimony from Magee that he was not involved. Rehak also impeached Freeman's credibility with his drug, gang, and criminal history, as well as with Freeman's plea agreement and participation in the robberies. He knew that Isabell and Ryan could not provide Magee with alibis for the bank robberies, and so he decided to focus his investigation on the crimes Magee was charged with. And looking at Rehak's performance as a whole, he served his client adequately. He met with Magee nine times before trial, vigorously cross-examined Freeman, Spires, and other government witnesses, and elicited favorable testimony from Magee. It is true that the testimony of Isabell, Ryan, and Pointer might have undercut further Freeman's credibility, but we conclude that Rehak's overall performance fell within the "wide range of professionally competent assistance" that is constitutionally sufficient. *Strickland*, 466 U.S. at 690.

Even if Rehak's decision not to interview these witnesses fell outside the range of adequate assistance, his error did not prejudice Magee. *See United States v. Best*, 426 F.3d 937, 946 (7th Cir. 2005) (court need not decide if counsel's performance was deficient if it determines defendant cannot show prejudice). A defendant has suffered prejudice if there is a reasonable probability, sufficient to undermine confidence in the outcome of the trial, that the jury verdict would have been different had the attorney's representation been sufficient. *See Strickland*, 466 U.S. at 693; *Badelle*, 452 F.3d at 662. In assessing whether there has been prejudice, we look at all of the evidence presented at trial; so an attorney's errors are more likely to be prejudicial when a verdict is based on weak evidence than when there is overwhelming support for the verdict in the record. *See Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006). Magee argues that it was critical for him to present evidence that Freeman lied about Magee's involvement in the shooting. He contends that if the jury had believed Magee did not shoot Freeman, it might have concluded that Freeman had no reason to be scared of Magee, calling into question Freeman's version of the robberies—that Magee intimidated him into participating. And, the theory goes, if the jury had thought Freeman willingly committed the robberies, it would have decided that Magee was not involved.

But Magee's argument ignores that much of Freeman's version of the robberies was corroborated by Spires. *See Lowery v. Anderson*, 225 F.3d 833, 844 (7th Cir. 2000) (defendant not prejudiced by attorney's failure to impeach witness with additional evidence where witness's credibility already had been challenged and his testimony was corroborated by

other witnesses).  Spires testified consistently with Freeman's version of the February robbery.  He said that Magee recruited Freeman; that Magee gave Freeman a gun, a bag, and a note for the teller; that Freeman first refused to go through with the plan; and that Magee persuaded him to do it.  Moreover, although he testified he did not participate in the April robbery, Spires did say that Magee admitted his involvement and that he helped Magee look for the stolen money Magee was forced to toss out of the window during the escape.  And even if the jury had concluded that Magee did not shoot Freeman, it still could have believed that Freeman was scared of Magee.  It could have credited Freeman's testimony that he owed Magee money, that Magee sent Mack and Jeremiah to try to collect and to threaten him, and that, before the April robbery, Magee threatened to kill Freeman's girlfriend if he refused to go along with the plan.  Therefore, Magee suffered no prejudice from his attorney's failure to interview Isabell, Ryan, and Pointer before trial.

AFFIRMED.