In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2154

Harold Shasteen, James Shasteen
and Dan Shasteen,

Petitioners-Appellants,

v.

Howard W. Saver, Director of Southern
Illinois Community Correctional Center,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Illinois, East St. Louis Division.
No. 95 C 216--Gerald B. Cohn, Magistrate Judge.

Argued April 12, 2001--Decided June 5, 2001

   Before Flaum, Chief Judge, and Manion and
Kanne, Circuit Judges.

   Flaum, Chief Judge. On March 10, 1995,
the Shasteens filed a petition for a writ
of habeas corpus, pursuant to 28 U.S.C.
sec. 2254, asserting various claims. The
district court denied all of these, but
issued a certificate of appealability
with regard to their prosecutorial
misconduct claim. For the reasons stated
herein, we affirm.

Background

   The Shasteens owned and operated a
buyers' club known as the Peoples $avings
Service. The premise of a buyers' club is
that it provides members, who pay a fee
to join the club, the opportunity to
purchase merchandise at a substantially
lower price than they would pay
retailers, and the club generates profits
from the sale of new memberships or the
renewal of existing memberships. When the
Shasteens opened their buyers' club in
the mid-1970's, people purchasing
membership contracts often would finance
the fees through local banks. In the
early 1980's, the banks would no longer
supply capital for new memberships and so
the Shasteens established a separate
company to fund membership contracts. To

raise the necessary capital to finance the membership contracts, the Shasteens began offering promissory notes for sale at interest rates higher than the rates for certificates of deposit.

On April 5, 1990, the Secretary of State's Office served Dan Shasteen with an order to cease and desist the sale of unregistered securities. The State indicted the Shasteens on various counts, relating to securities fraud and theft by deception. After a jury trial before the Circuit Court of Williamson County, Dan, James, and Harold/1 were convicted of: (1) conspiracy to commit securities fraud in violation of 720 ILCS 5/8-2(a) and (2) securities fraud in violation of 815 ILCS 5/12(G). Dan was convicted of a second count of securities fraud in violation of 815 ILCS 5/12(I). The trial court vacated the defendants' conspiracy convictions. James and Harold were sentenced on the basis of the securities fraud conviction and Dan was sentenced concurrently on his two securities fraud convictions. Dan, James, and Harold were sentenced to 10 years in the Department of Corrections.

The Shasteens, unhappy with the outcome of their case, appealed unsuccessfully to the state courts (Illinois Appellate Court and the Supreme Court of Illinois). Having exhausted their options at the state level, the Shasteens began the process at the federal level by filing a petition for writ of habeas corpus in district court on March 10, 1995. The magistrate judge denied the Shasteens' petition for writ of habeas corpus, and denied the Shasteens' motion to alter or amend the judgment. The magistrate judge granted the Shasteens' motion for certificate of appealability with regard to their prosecutorial misconduct claim, stating that he found that "the Petitioners have made a substantial showing of the denial of a federal right; the Court finds that the issue raised concerning whether the State intentionally, knowingly, or recklessly used false testimony is debatable among reasonable jurists and that a court could resolve the issue differently [than] this Court did."

It is necessary to review some of what occurred at trial to understand the question we must confront on appeal. During the trial, the State presented a

variety of evidence to prove that the Shasteens committed theft by deception and securities fraud. Steve Kirk, a senior auditor with the Secretary of State's Office, Enforcement Division, testified that the Shasteens were involved in a Ponzi scheme, whereby they would take money from new investors to pay off previous investors. John Paul Schmerbauch, also testified as an expert witness for the State. He examined the Shasteens' business tax returns and noted that the Shasteens continued to sell notes during the mid-1980's, after their business showed a loss. Although Schmerbauch acknowledged that a business may have a negative value, according to the Illinois Appellate Court, "Schmerbauch opined that it was possible, but it would be extremely difficult, to turn this business around." Several former employees testified about the nature of the Shasteens' business, including Marsha Bartlett, who said that she was instructed to show investors who asked for a financial statement a balance sheet indicating one dollar of assets for each one dollar of liability. Candace McCurdy, who occupied Bartlett's position after she left, testified that she knew the Shasteens' business was not making money, but she still showed potential investors an even balance sheet. Eight noteholders testified, some of whom said that they knew that the notes were not insured and were not concerned about the financial condition of the buyers' club because they simply desired the high rates the Shasteens were offering them. However, other noteholders were not aware of the company's poor financial condition. Several investors testified that they were told that the business was extremely successful or it had enough money to cover all of the investments. The Shasteens never informed any investor that the business was losing hundreds of thousands of dollars per year. The last noteholders called by the State were Edgar and Delphine Misselhorn who testified that they purchased $18,000 worth of notes from Dan on April 6, 1990, which was one day after the cease and desist order was issued.

The State's theory was that the Shasteens were operating a Ponzi scheme to defraud investors. The Shasteens contended that they were running a viable business and that they were doing all

that they could to make it successful. The Shasteens argued that there was no evidence that they missed an interest payment or that noteholders were ever refused their money when they asked to redeem their notes. They presented other evidence as well to prove that their company was not a sham. Thus, the Shasteens advanced that because they believed that they were running a legitimate business, they lacked the mens rea to commit fraud. According to the Shasteens, "the State used the testimony of Edgar and Delphine Misselhorn[,] who stated under oath that they purchased a note on April 6, 1990, one day after the issuance of the Cease and Desist Order [to highlight] the Shasteens' purported violation of the Order[,] as the key evidence of the Shasteen[s'] criminal intent, or mens rea and timed the presentation of the Misselhorns' testimony to achieve the maximum possible impact on the jury." They argue that the "prosecutor did this despite overwhelming evidence (of which he was aware both before and during the trial) that the testimony was false." Our task on appeal is to determine whether the prosecutor knowingly used false testimony.

## Discussion

### Prosecutorial Misconduct

A federal court may grant a writ of habeas corpus when a person is held in custody under a state court judgment in violation of the United States Constitution. See Lowery v. Anderson, 225 F.3d 833, 838-39 (7th Cir. 2000). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), does not apply to noncapital cases when the petitioner files a writ of habeas corpus prior to the Act's effective date. See Everett v. Barnett, 162 F.3d 498, 500 (7th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)). The Shasteens filed their petition on March 10, 1995, well before the effective date of AEDPA, so our review is plenary. See Lowery, 225 F.3d at 839. Keeping in mind pre-AEDPA standards, we presume that factual issues that the state trial or appellate courts have decided are correct, see Rodriguez v. Peters, 63 F.3d 546, 554 (7th Cir. 1995), while questions of law or mixed questions of law and fact considered by state courts we examine under a de novo

standard, see Lowery, 225 F.3d at 839. With regard to the district court's decision to grant or deny a writ of habeas corpus, we review the court's findings of fact under a clearly erroneous standard, see Kavanagh v. Berge, 73 F.3d 733, 735 (7th Cir. 1996), and questions of law de novo, see Lieberman v. Washington, 128 F.3d 1085, 1091 (7th Cir. 1997).

We now turn to the Shasteens' prosecutorial misconduct claim. "The Supreme Court has clearly established that a prosecutor's knowing use of perjured testimony violates the Due Process Clause." Schaff v. Snyder, 190 F.3d 513, 530 (7th Cir. 1999). When the defendant argues that the government allegedly used perjured testimony, to warrant setting the verdict aside and ordering a new trial, the defendant must establish that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. See United States v. Saadeh, 61 F.3d 510, 523 (7th Cir. 1995); United States v. Verser, 916 F.2d 1268, 1271 (7th Cir. 1990). "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." Verser, 916 F.2d at 1271 (internal citations and quotation marks omitted). "[T]he alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." United States v. Adcox, 19 F.3d 290, 295 (7th Cir. 1994). We must determine, when the defendant alleges that the prosecution used perjured testimony, whether the defendant had an adequate opportunity to expose the alleged perjury on cross-examination. See Saadeh, 61 F.3d at 523. A defendant need not prove beyond a reasonable doubt that the witness's stestimony was "knowingly false (and hence perjury)." United States v. Boyd, 55 F.3d 239, 243 (7th Cir. 1995). In fact, "[t]he wrong of knowing use by prosecutors of perjured testimony is different, and misnamed--it is knowing use of false testimony. It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false." Id.  As a consequence, we do not employ the term

of perjury in a technical, legal sense in these types of cases, but rather as a term of art that describes the knowing use of false testimony.

The Shasteens maintain that Charles Garnati, the State's Attorney of Williamson County who prosecuted their case, knowingly used the perjured testimony of Edgar and Delphine Misselhorn to bring about their convictions. The Illinois trial court held an evidentiary hearing on this matter after the jury convicted the defendants. Both the trial court and the Illinois Appellate Court denied the Shasteens' request for a reversal in their case. As previously noted, during the Shasteens' trial, the Misselhorns testified last and said that they purchased $18,000 worth of notes from Dan Shasteen on April 6, 1990, which was one day after the Secretary of State's Office issued the cease and desist order. According to the Shasteens, the Misselhorns' testimony revealed that they violated the cease and desist order and thus showed that they had the requisite mens rea or criminal intent to defraud the purchasers of the notes.

The Shasteens and the State agree that the first time the issue of whether the Misselhorns postdated the note arose was during the testimony of Candace McCurdy, who was an employee in charge of the ledger prior to the State's seizure of it. As it turns out, the State had in its possession the ledger in which the defendants recorded the notes that they sold. The ledger revealed that the original promissory note issued to Delphine Misselhorn was number 6420 and was dated April 6, 1990. The defendants, however, retained a copy of the note and it contained a notation that stated that the note was postdated. The notes preceding and following note 6420 were issued on March 23, 1990 and the last note sold was number 6422 and was dated April 3, 1990. The Shasteens argue that Garnati knowingly used perjured testimony because he had in his possession the ledgers that revealed the note that the Misselhorns purchased was postdated and he had an obligation to look at those records. After McCurdy's testimony, when Garnati began to wonder if the note was postdated, he contacted the Misselhorns to verify the note was not postdated.

Mrs. Misselhorn said that she had verified the date by examining her husband's checkbook, but Garnati never asked her to inspect either the checkbook or a copy of the check itself. In a deposition taken over five years after she had been removed from the case, Assistant Attorney General Barbara Stackler claimed that she and Garnati interviewed the Misselhorns for two hours. Stackler recalls having told Garnati, "Chuck, you can't use these people. I said they're going to perjure themselves. They're trying to avoid the truth and even though their testimony, their perjured testimony, will benefit the prosecution, you can't use them. I said I won't allow it." The Shasteens assert that Garnati had the opportunity to learn that the Misselhorns' testimony was false and Stackler warned him that this was the case, therefore he knew or should have known that the Misselhorns' testimony was false. They argue that once this became clear, Garnati should have moved to withdraw or have stricken the Misselhorns' testimony.

The Shasteens further argue that there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. Garnati placed a great deal of emphasis upon the Misselhorns' testimony, as seen by the fact that during his opening statement, he told the jury that the Misselhorns' testimony would prove that the defendants were not "just good honest people who made some bad business judgment[s]." The Shasteens contend that via the Misselhorns' testimony, the prosecutor intended to show that they were individuals who acted in defiance of the Secretary of State's cease and desist order and sold the note to the Misselhorns without informing them that they should no longer sell notes. Further, the Misselhorns testified last and the Shasteens claim that the transcript/2 of the trial reveals that Garnati relied upon the Shasteens' testimony during his closing rebuttal argument. The Shasteens assert that the State used the Misselhorns' testimony to prove that the Shasteens possessed the criminal intent to intentionally defraud purchasers by selling notes when they knew that the company would never generate a profit. The Shasteens received the maximum sentence possible and have

fully served their terms of imprisonment. Therefore, they do not seek a new trial, which is the kind of relief ordinarily requested when there has been a knowing use of false evidence. Instead, the Shasteens seek expungement of their criminal records and the attorney's fees that they incurred while prosecuting the habeas case and the direct appeals in state court.

The Shasteens' arguments are not convincing. The State conceded during oral argument that there is really nodispute that the Misselhorns were incorrect when they testified that they wrote the check for the note on April 6, 1990. The Misselhorns at trial testified that they purchased the note on April 6, 1990, sometime after noon. However, as the Illinois Appellate Court concluded, "Ultimately, it became clear that the note could not have been purchased on April 6 because Mrs. Misselhorn's employment records indicate she was working on that date. Also, her [husband's] checkbook showed that the check dated April 6, 1990, was written prior to that date." Nevertheless, the State maintains that Garnati did not knowingly use perjured testimony. During the evidentiary hearing several facts came to light. Garnati testified that after McCurdy's testimony, he became aware that note number 6420 may have been postdated. Although Garnati admitted that he had possession of the ledger in which the defendants recorded the notes that they sold, he testified he did not review the ledger after McCurdy's testimony. Instead, Garnati called the Misselhorns and inquired as to whether the note was postdated. Mrs. Misselhorn assured Garnati that she purchased the note on April 6 because she checked her records. She did, however, inform Garnati that she may have told the defense attorney that she postdated the check, but upon further review, she believed that the note was purchased on April 6. Garnati told the Misselhorns that it was important for them to the tell the truth to the best of their recollection.

Stackler's account of what transpired between herself and Garnati is somewhat problematic; however, it must be considered within the proper context. Stackler signed a post-trial affidavit dated May 19, 1992, in which she stated,

"During my interview with the Misselhorns, it became apparent to me that they were confus[ed] and unable to remember clearly or consistently the events of two years ago. As a result, I had some concern about calling the Misselhorns as witnesses [at] trial. I expressed that concern to Charles Garnati." At the evidentiary hearing, Garnati said he did not recall having a conversation with Stackler about her concerns regarding the Misselhorns' testimony. Five years later, in a deposition, Stackler contends that she told Garnati that she believed the Misselhorns were "going to perjure themselves." The magistrate judge, however, said that "in a memorandum [which Stackler wrote a little more than a week after her removal from the case] regarding her removal from the Shasteen case, nowhere does she mention any concerns about the Misselhorns' testimony." In her memorandum, she made no mention of her concerns regarding the testimony of the Misselhorns or her belief that they would perjure themselves. In an affidavit after trial, she spoke of her concerns regarding the Misselhorns' testimony, but did not specifically question whether they purchased the note on April 6. Over five years later, in a deposition, is when Stackler stated that she informed Garnati that she believed the Misselhorns were going to commit perjury. Stackler's story is inconsistent and therefore cannot be relied upon to show that Garnati knowingly used perjured testimony, especially since he stated he did not remember talking with Stackler about the concerns she had with regard to the Misselhorns' testimony. Therefore, the district court's finding was not clearly erroneous.

When one contemplates the circumstances of this case, it is difficult to find misconduct in connection with Garnati's actions. As the State noted at oral argument, the Shasteen case was a large prosecution that spanned a nine-year-period, involved many noteholders, almost 5 million dollars, and the State's attorney was inexperienced in this type of prosecution. The case simply involved a long trial and a large number of exhibits. The Illinois State Appellate Court remarked, "It is easy to second-guess the prosecutor now that all the

facts are disclosed. At the time, however, the prosecutor was shown a copy of the note dated April 6 and was told by a confident Mrs. Misselhorn that she and her husband in fact purchased the note on April 6." The Shasteens also had adequate opportunity to expose the alleged perjury on cross-examination. According to the Illinois Appellate Court, "once the inconsistencies were pointed out, the State produced the records necessary to discredit the Misselhorns' testimony." The Illinois Appellate Court noted, "The jury was apprised of the fact the notes were purchased prior to April 6. As the trial court pointed out, defense counsel did an outstanding job of drawing out the inconsistencies between the Misselhorns' testimony and the evidence shown by bank records, the notation on defendants' copy of the note, and the other witnesses' testimony that the note was indeed postdated. At the hearing, defense counsel asserted: 'we brought out evidence that proved what they said could not be true.'" The Shasteens acknowledge that during the trial, they were able to argue that money was deposited in the Misselhorns' checking account on April 5 and the check the Misselhorns' wrote for the note cleared on April 6; thus, this evidence suggests that the check written for the note was issued before April 6. While we recognize that it would have been preferable if Garnati had checked the ledger and not relied solely on the Misselhorns' representations concerning the date of the note, we cannot say that his behavior resulted in a knowing use of perjured testimony. This is especially the case since the Shasteens were able during the trial to show that the Misselhorns did not purchase the note on April 6. Therefore, the Shasteens had ample opportunity to expose the alleged perjury, thus minimizing its impact. See Saadeh, 61 F.3d at 523-24. Therefore, we affirm the district court's decision to deny the Shasteens a writ of habeas corpus.

Conclusion

   For the reasons stated herein, we AFFIRM the decision of the district court.

FOOTNOTES

/1 The magistrate judge determined that "[s]ince the filing of this Petition, Harold Shasteen has

passed away and is no longer being considered for habeas corpus relief due to his death." In an order, we agreed with the magistrate judge that Harold Shasteen's claim was moot, referencing McClendon v. Trigg, 79 F.3d 557 (7th Cir. 1996). The Shasteens would like us to reconsider our position on this matter, despite the fact that this issue was not certified for appeal. We decline to revisit our decision on this issue and therefore find that Harold Shasteen is no longer a part of this action.

/2 Although not certified as an issue for appeal, the Shasteens ask for review of the magistrate judge's decision to deny them the right to supplement the record. The Shasteens contend that the transcript of their trial was omitted from the record because the Illinois courts lost said document. However, after the magistrate judge denied their writ of habeas corpus, the Shasteens found their own copy of the trial transcript and petitioned the magistrate judge to supplement the record with it. The Shasteens wanted the magistrate judge to correct the error stemming from the loss of the record; however, the magistrate judge denied the Shasteens' request, even though he was aware that the record apparently could not be located prior to his decision. Relying upon Federal Rules of Appellate Procedure 10(e)(2)(C) and 10(e)(3), the Shasteens urge that we should supplement the record of our own accord. The difficulty with the Shasteens' position is that "[t]he purpose of Rule 10(e) is to ensure that the court on appeal has a complete record of the proceedings leading to the ruling appealed from, not to facilitate collateral attacks on the verdict. Rule 10(e) does not give this court authority to admit on appeal any document which was not made a part of the record in the district court." United States v. Hillsberg, 812 F.2d 328, 336 (7th Cir. 1987) (internal citations and quotation marks omitted). At this point, the trial transcript would not further aid us because there was extensive discussion of what occurred at trial by the Illinois Appellate Court, the magistrate judge did not rely upon it, and the Shasteens do not specifically explain why the trial transcript would further assist us in resolving the current issue on appeal. For all of these reasons, we deny the Shasteens' request to supplement the record.