Dale **MAREK**, Petitioner–Appellant,

v.

William **GROSSHANS**, Administrator, Division of Probation and Parole, Respondent–Appellee.

No. 02–1806.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 2002.

Decided Dec. 2, 2002.

Before DIANE P. WOOD, EVANS, and WILLIAMS, Circuit Judges.

### ORDER

This is an appeal from a denial of habeas relief to Dale Marek, who was convicted several years ago of multiple counts of second degree sexual assault in a Wisconsin state court. Marek had sought relief on several grounds, most notably a claim that his state trial lawyer's performance was constitutionally inadequate.

The events giving rise to the charges occurred about 11 p.m. several Aprils ago, when Marek arrived at the Milwaukee home of his longtime friend, Greg Dornoff. After Dornoff and Marek drank a few beers, Dornoff told Marek he could sleep on the couch or in the vacant bedroom of Dornoff's stepdaughter. Dornoff then went to bed.

Dornoff's 16–year–old stepson, Allen Holzbauer, says that at the time, he was sleeping in an adjacent bedroom next to his friend, Christopher Spiros, in a double-size bottom bunk. Holzbauer's 9–year old brother, Mikey, slept on the top bunk. Holzbauer said he woke up when Marek sat down on his bed and pushed him over so that he could fit on the bottom bunk with the two boys.

Holzbauer testified at Marek's trial that he fell asleep but awoke later to find his underwear "pulled down in front" and Marek "sucking" on his penis. Holzbauer said he was "scared" and "didn't know what to do," so he rolled over onto his stomach "to get [Marek] off me." He said he then fell asleep but awoke again to find Marek with "his hand down the back of my underwear," rubbing Holzbauer's buttocks. Holzbauer said the pattern repeated itself one last time, when he awoke to find Marek's left hand rubbing Holzbauer's penis. Holzbauer testified that after the third incident, he climbed out of bed and went into the living room, where he spent the rest of the night on the couch. Holzbauer says when he woke up the next morning, he went back into the bedroom and found Marek "wrestling" with and "tickling" Mikey, the younger brother. Dornoff testified that the morning after the alleged assault, Holzbauer told him that Marek had crawled into bed with them and that Holzbauer "was real upset about it." He said he promised Holzbauer that he would talk to Marek but that he did not see Marek again until after Holzbauer reported the incident.

Marek told a different story. He claimed that Holzbauer either dreamt that he was assaulted or that he was lying: Marek testified that he wandered into the boys' room and briefly turned on the light in search of a blanket. When Holzbauer woke up, Marek claims he told Holzbauer he was going out to sleep on the couch, but Holzbauer persuaded him to stay in the bed with the two boys. Marek says he went to sleep and didn't wake up until Holzbauer poked him in the ribs the next day.

The next morning, Holzbauer went "practice driving" with Marek in Marek's car. According to a typewritten police report from a detective named Carlson, Holzbauer said that Spiros went driving with them. At trial, however, Holzbauer testified that he did not tell Detective Carlson that Spiros went with them. Detective Carlson testified that the confusion resulted from an entry in the memo book he used to take notes during his interview with Holzbauer. The entry read "Holzbauer states Dale took him out driving after they got up. Dale suggested it." Detective Carlson said he failed to clarify what Holzbauer meant by "they." He testified: "The driving part came up near the end of the interview ... Holzbauer asked or Dale asked them if they wanted to go driving and they left. I took the word 'they' to mean the three of them. I didn't clarify it with him."

At trial, both sides agreed that Marek and Holzbauer went driving without Spiros. Holzbauer said that he did not talk to Marek about the night before because he was "scared" and "just wanted to put it behind him." Marek dropped Holzbauer off at home around noon and did not see him at all the following week. Seven days after the incident, Holzbauer told his girlfriend and Spiros about the assaults. At their urging, Holzbauer reported the incident to a school security guard the following Monday. The state criminal charges followed.

A jury found Marek guilty of three counts of second degree sexual assault, for which he received a 7–year prison term with a consecutive 4–year term of probation. After exhausting his state court appeals, Marek filed an amended petition for federal habeas relief on the grounds that his trial counsel rendered ineffective assistance by failing to investigate or call witnesses attesting to Marek's character for truthfulness; he was denied due process by the presentation of false evidence by a member of the prosecution team; and his trial counsel was ineffective for failing to note that the prosecution might have tampered with the evidence. Judge J.P. Stadtmueller denied the petition on all grounds.

Under the Antiterrorism and Effective Death Penalty Act of 1996, we will not grant relief on a claim that the state courts addressed on the merits unless the determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper,* 109 F.3d 330, 334 (7th Cir.1997). A state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington,* 106 F.3d 742, 749 (7th Cir. 1997).

To succeed in his ineffective assistance claim, Marek must demonstrate (1) that his counsel's performance was deficient, such that under normal circumstances it was unreasonable under prevailing professional norms; and (2) that he was prejudiced by his counsel's deficient performance. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Only a state court's "clear error" in applying the *Strickland* test would support a writ of habeas corpus because *"Strickland* builds in an element of deference to counsel's choices in conducting the litigation [and] § 2254(d)(1) adds a layer of respect for a state court's application of the legal stan-

dard." *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir.1997).

Marek claims that he gave his attorney, David Geraghty, a list of 15 to 20 names of people who were willing to testify to Marek's truthfulness, the fact that he is not a pedophile, or both. The attorney never talked to any of the people on the list and did not call any of them to testify. At a post-trial hearing, Geraghty testified that many of the people on the list were young boys or people Marek knew through his work as a Boy Scout leader, and the lawyer worried that calling them as witnesses would backfire because of the nature of the allegations. Marek now accepts that decision as reasonable. Still, Marek argues that he knew two people on the list, Jenny Renner and Donna Lieske, who were not associated with the Boy Scouts. Marek claims his lawyer's decision not to call Renner and Lieske was unreasonable, especially given the fact that Dornoff testified at trial that Marek "could tell a good yarn." Geraghty offered no strategic justification for his failure to call Renner and Lieske. The district court held that, whether or not Geraghty should have called the character witnesses, there was no reasonable probability that doing so would have changed the result of the proceeding. We agree.

Although Marek admits that defense character witnesses generally are not very persuasive, he argues that his case is different because the verdict depended almost entirely on the relative credibility of Holzbauer and Marek. He relies on *State v. Cuyler*, 110 Wis.2d 133, 327 N.W.2d 662 (1983), in which the court granted a new trial on the grounds that the lower court had wrongly excluded testimony of two police officers that the defendant was "truthful." Marek also claims that the jury might have concluded that the failure to call a character witness meant that Ma-

rek must have been lying because he couldn't find anyone to corroborate his testimony.

Although character witnesses generally "are not crucial," *United States v. Cockrell*, 720 F.2d 1423, 1428 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984), we can imagine cases that are so close that a reputation witness could make the difference. *See generally United States v. Burke*, 781 F.2d 1234, 1240 (7th Cir.1985) ("[R]eputation evidence" to evaluate the truthfulness of the defendant's testimony may "tilt the balance" in a "close case.").

This case, however, was not as close as Marek claims and did not necessarily come down to Marek's word against Holzbauer's. Jurors likely considered the positive extrinsic evidence they heard about Marek, including evidence that he held a computer-related job with the State of Wisconsin; he had attended Marquette University for 6 years; he has no criminal record; Holzbauer went driving alone with him the morning after the alleged assaults; and he had been alone on numerous occasions with Holzbauer, even sharing a bed with Holzbauer several times without incident. The jury likely also weighed testimony from Spiros and Holzbauer's girlfriend that Holzbauer cried when he told them about the assault. Perhaps even more significantly, the jury might have considered Marek's own story—that Holzbauer would invite a 6–foot, 200–pound man to join two teenage boys in a double bed, and that Marek would accept that invitation when he had other, more comfortable sleeping options in the house—to be farfetched. Given the substantial evidence on both sides, it is hard to imagine that the testimony of two of Marek's buddies as to Marek's truthfulness[1] would have swayed the jury.

1. Marek concedes that the witnesses could not have testified that Marek was heterosexu-

Marek's due process argument fails for many of the same reasons. Marek claims that the district court erred in denying his discovery request for testing of Detective Carlson's memo book entries to determine whether, as Marek suggests, Detective Carlson falsified an entry. Marek claims the issue was "newly discovered," thus requiring due process relief, or, in the alternative, that attorney Geraghty was ineffective for failing to discover the perjured testimony during the trial.

Marek's story goes as follows: Holzbauer first told Detective Carlson that Spiros went driving with them the morning after the assaults. When he heard Holzbauer say at trial that Holzbauer and Marek had gone alone, Detective Carlson, in an attempt to protect Holzbauer's credibility, added the confusing "Holzbauer states Dale took him out driving after they got up" entry to his notes as a way of explaining the change in Holzbauer's story. Marek wanted to test the ink in Detective Carlson's memo book in an attempt to show that Detective Carlson wrote that entry at a different time than he wrote the rest of his notes.

■ The State's knowing use of false evidence or perjured testimony deprives a defendant of due process and a fair trial when the evidence is material to guilt or punishment. *See Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir.2001). Therefore, a defendant must show (1) the prosecutor's case included perjured testimony; (2) the prosecutor knew or should have known about the perjury; and (3) there is a reasonable likelihood that the false testimony could have affected the judgement of the jury. *Id.* The district court upheld the Wisconsin Court of Appeals' findings that there is no reasonable likelihood that the false testimony would have affected the judgment of the jury. Again, we agree.

Even if Marek were able to prove that Detective Carlson falsified the memo entry, the outcome of the case likely would not have changed. While such evidence would reflect poorly on Detective Carlson, it might not have damaged Holzbauer's credibility to the extent Marek claims. The whole reason the driving episode is relevant is to bolster Marek's claim that Holzbauer did not react as though he had been assaulted. (Most victims would not choose to spend time with one who assaulted them the morning after an assault.) Marek's claim is only strengthened by the fact that Holzbauer voluntarily spent the following morning alone with Marek, a fact that was not disputed at trial. Therefore, in order for the ink sample to have any effect on Holzbauer's credibility, the jury would have to believe that he changed his original story (that Spiros went with them) to one that made him less credible (that Holzbauer went driving alone with Marek). Jurors knew both that Marek chose to sleep in the same bed as the boys even though an empty bed and sofa were available and that Holzbauer voluntarily went driving alone with Marek the next morning. They weighed those facts, along with the testimony of the witnesses, and found Marek guilty. The Wisconsin courts reasonably found that a weak potential attack on Holzbauer's credibility would not have changed that outcome.

AFFIRMED.

---

al or that he had not molested other boys despite numerous opportunities to do so. *See State v. Friedrich*, 135 Wis.2d 1, 398 N.W.2d 763 (1987) (upholding trial court decision to exclude opinion evidence that defendant was not the type of person to commit a sex offense and did not "fit the profile" of a sex offender); *State v. Tabor*, 191 Wis.2d 482, 495–96, 529 N.W.2d 915, 921 (Wis.Ct.App.1995).