In the

# United States Court of Appeals

### For the Seventh Circuit

No. 05-3372

MICHAEL CHEEKS,

*Petitioner-Appellant*,

*v.*

DONALD GAETZ,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-CV-01354—**Suzanne B. Conlon**, *Judge*.

ARGUED SEPTEMBER 11, 2006—DECIDED JULY 7, 2009

Before RIPPLE, KANNE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* During and after Michael Cheeks's trial for murder and home invasion, he received letters from his former girlfriend, Maria Brown, who was also a witness at trial. These letters, he argues, demonstrate that the government knew Brown testified falsely during his trial about whether he was living at the home where the death occurred, at the time it occurred. Cheeks's counsel used the letter received

during trial that asked why he came "home" to cross examine Brown; nonetheless, a judge convicted him on all counts after a bench trial. When Cheeks received additional letters after trial, the state court held an additional hearing. Brown testified, and the state court concluded her testimony had not been falsified. Cheeks maintains that the state court's decision to uphold his convictions do not control here because the state court did not rule on his federal claim that the State knowingly presented false testimony at trial. Testimony about whether he was living at the home had no effect on his first-degree murder conviction, however. The state court transcripts confirm that it rejected Cheeks's self-defense argument not because he had committed a forcible felony, but because he was the initial aggressor. Cheeks received concurrent sentences for the murder and home invasion counts, and Cheeks points us to no benefit that would come from reviewing only his home invasion conviction. We therefore deny his petition for a writ of habeas corpus.

## I.  INTRODUCTION

Michael Cheeks, Maria Brown, and their child moved into a home on Hickok Street in University Park, Illinois in November 1995. The home was rented from Brown's cousin, and only Brown's name was on the lease. In March 1996, while Brown and Cheeks were still living together, Brown began dating Derrick Peterson without telling Cheeks. On August 30, 1996, Brown informed Cheeks that he could no longer live in the Hickok Street

home. Nonetheless, Cheeks was at the home on the morning of September 22, 1996. Brown called Cheeks's mother later that day and asked her to tell Cheeks not to come to Brown's home that night. Brown could hear Cheeks in the background during the conversation and heard his mother give him the message.

That night, Brown went to sleep in the Hickok Street residence while Peterson watched television in her bedroom. Peterson, fully clothed, later woke Brown, wearing a nightshirt, to say he thought someone was in the house. Brown got out of bed and encountered Cheeks in the hallway. After Cheeks let go of Brown, she went to her bedroom to call 911. Cheeks came into her bedroom holding a knife and cut the phone cord. When Cheeks saw Peterson, Cheeks said, "You don't have a man in my house, do you? . . . Man, get out of my house before I kill you." Peterson tried to run out of the house but fell in the hallway, and Brown could hear the two men struggling. She followed the men down the hallway and asked Cheeks what he had done. When a motion sensor light came on, she saw a pool of blood. Brown suggested that Peterson sit down because he was losing blood, and Cheeks pushed Peterson to the ground. An officer arrived shortly thereafter and found Cheeks outside with his hand on the door handle of a car's driver's side. After the officer told Cheeks to lay down, Cheeks said, "Go ahead and shoot me" to the officer three or four times. Paramedics arrived within a few minutes, but Peterson had passed away. The coroner later concluded that Peterson died from a single stab wound to the chest.

Cheeks was charged with Peterson's murder and with home invasion in Illinois state court. During the ensuing bench trial, Cheeks received a letter from Brown that said, "I must make you pay for what you did when I take the stand . . . . I'm still confused about that night you know I really don't know exactly what I said in my statement . . . I held myself responsible for his life so now I have to make sure that you get held responsible for his death instead of me . . . when I'm done with you believe me you will never see the light of day if I have anything to do with it and I do cause what the jury is gonna think of you when I leave the stand is that you deserve life . . . ." The letter also said, "you know he [Peterson] could have killed you but he didn't he spared your life . . . maybe you was afraid maybe he intimidated by being so much bigger than you and not showing any fear." The letter also asks, "Why did you come home?" Cheeks's counsel used the letter to cross examine Brown at trial.

Brown testified at trial and said at one point that Cheeks did not have permission to be in her home the evening of Peterson's death. At another point, she was asked, "[I]s it fair to say that Michael Cheeks was, in fact, living at the location on Hickok after August 30, 1996?" She responded, "He was there after that but not with my permission, yes." She also testified that she considered him not living at the house after August 30, though she acknowledged that she had not had him removed when he subsequently came back. In response to the question, "And at that time Michael Cheeks was still living in your house on September 21, 1996; is that correct?", Brown answered, "He was still there."

An investigating officer testified that he found posses-sions belonging to Cheeks at the Hickok residence and that Cheeks's identification cards showed he lived at the Hickok address. Law enforcement officials also testified that they saw what appeared to be blood on the waist-high kitchen window, that Cheeks's hat was found in the sink below the window, and that a box of kitty litter partially blocked the locked back door when they arrived. One officer testified that after receiving his *Miranda* rights, Cheeks said he had entered through the back door but then had no response to the question of how he could have done so without disturbing the box of kitty litter. At the close of the evidence and after hearing arguments from both sides, the judge found Cheeks guilty of murder and home invasion. At the sentencing hearing, the judge stated he had decided to impose a sentence above the statutory minimum because Cheeks was on parole at the time of the offense, had been in and out of the criminal justice system for the previous eleven years, and had a criminal history including stolen cars, drug dealing, and drug possession. The judge sentenced Cheeks to concurrent terms of thirty-five years' imprisonment on the murder charges and twenty years' imprisonment for home invasion.

Following the trial, Brown wrote additional letters to Cheeks. In one, she wrote:

> I was advised that was the way to go . . . I wanted you to go to [j]ail for my o[w]n personal reasons and who knows maybe if I had told the truth about you living their you wouldn't have so much time, but I seen a way to get you out of my life and I took it.

In another letter, she wrote:

> . . . Oh and no hard feelings about you not living their you see I wanted you to go to jail and if I had actually let someone know that you was living their you may have not went at least that is what was advised of me the very first night.

She signed this letter, "gotta go ha ha ha ha ha ha ha ha ha ha your grim reaper."

After receiving these post-trial letters, Cheeks filed a pro se petition in Illinois state court under Illinois's Post-Conviction Hearing Act. He argued that his counsel was ineffective for failing to reveal perjury by the State's key witness and attached copies of the two post-trial letters. An Illinois Circuit Court judge denied the request. Cheeks then appealed, arguing that the trial court should have considered the post-conviction petition as a claim under 735 Ill. Comp. Stat. 5/2-1401, which provides a statutory means of obtaining relief from certain judgments, including those based on perjured testimony. The Illinois Appellate Court agreed and concluded that Cheeks had stated a claim under that provision. *Illinois v. Cheeks*, 742 N.E.2d 915, 922 (Ill. App. Ct. 2001).

Back in the Illinois Circuit Court, Cheeks moved to vacate the judgment pursuant to 735 Ill. Comp. Stat. 5/2-1401 and again argued that Brown had given false testimony at his trial as evidenced by the letters he had received from her. The parties filed a stipulation that, if called to testify, Brown would testify that the statements made by her in the letters were true. The Circuit Court

denied Cheeks's motion to vacate. After Cheeks moved for reconsideration, the court held a hearing. Brown testified, saying that on the date of the incident, Cheeks lived with her "on a part time basis" and "was free to come and go as he pleased." The Circuit Court denied the motion for reconsideration, concluding that the position Brown took at the hearing as to whether Cheeks lived at the residence on the date of Peterson's death was "yes and no, which is pretty much the position she took during the course of the trial." Cheeks appealed, and the Illinois Appellate Court affirmed, saying that Cheeks had "not proved by clear and convincing evidence that Brown's testimony was perjured." It noted that Brown testified at trial both that she did and did not consider Cheeks to live at the Hickok residence between August 30, 1996 and September 23, 1996. And, said the Appellate Court, "she testified to the same at the section 2-1401 hearing." In addition, the Appellate Court ruled that the post-trial letters contained evidence that was cumulative to that presented at trial since the letter received during trial contained the statement, "why did you come home," and Cheeks used this statement as a basis for extensive cross examination regarding whether Cheeks lived at the residence on the night of Peterson's death. The court therefore affirmed the Circuit Court's denial of Cheeks's motion to vacate the judgment. The Supreme Court of Illinois denied leave to appeal.

Cheeks then filed a pro se petition for a writ of habeas corpus in federal district court, alleging that the "State knowingly used perjured testimony to obtain [the] conviction." The district court denied Cheeks's habeas request and ruled that Cheeks had not demonstrated

that the state court's holding that Brown did not commit perjury was an unreasonable determination of the facts. It concluded that the "trial and appellate courts' findings that Brown did not commit perjury are at least minimally consistent with the evidence." It did not obtain the trial court transcripts before making this determination (and it seems to us a difficult determination to make without the transcripts; they have been added to the record after argument on appeal). Cheeks appeals the denial of his request for a writ of habeas corpus.

## II. ANALYSIS

### A. Standard of Review

As a person in custody pursuant to a state court judgment, to be eligible for a writ of habeas corpus Cheeks must demonstrate that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Guest v. McCann*, 474 F.3d 926, 931 (7th Cir. 2007). When a habeas petitioner's claim was "adjudicated on the merits in State court proceedings," section 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court may grant a writ of habeas corpus only if: (1) the state court's adjudication of the claim was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court of the United States, 28 U.S.C. § 2254(d)(1), or (2) the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

Section 2254(d) does not control here, though, because, as we said, it only applies to a claim that was "adjudicated on the merits in State court proceedings." *See* 28 U.S.C. § 2254(d); *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005). Cheeks did not present to the state court his current claim that the government *knowingly* used false testimony against him, and the state court never ruled on this claim. As a result, this claim was not "adjudicated on the merits in State court proceedings" for purposes of § 2254(d). Therefore, we use here the general standard set forth in 28 U.S.C. § 2243, which requires us to "dispose of the matter as law and justice require." *See Guest*, 474 at 931; *Canaan*, 395 F.3d at 382; *Braun v. Powell*, 227 F.3d 908, 917 (7th Cir. 2000).

### B.    Procedural Default

That Cheeks did not raise his current claim in the state court leads to another issue. The State argues that we should not consider his current claim because it has been procedurally defaulted. In his petition for a writ of habeas corpus, Cheeks asserted that the State knowingly used false testimony to obtain his conviction. A prosecutor's knowing use of false testimony violates the United States Constitution's due process clause. *United States v. Agurs*, 427 U.S. 97, 103 & n.8 (1976); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942); *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001). A witness's testimony need not have been "knowingly false (and hence perjury)" to succeed on such a claim; rather, a prosecutor's knowing use of *false* testimony is enough to infringe upon a defen-

dant's right to due process. *Shasteen*, 252 F.3d at 933 (quoting *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995)).

The State maintains that Cheeks should not be allowed to bring this argument in his habeas proceeding because he did not first raise it in the state court. A state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). To afford the State this opportunity, the prisoner should fairly present his federal claim to each appropriate state court before seeking relief in federal court. *Id.*; *Perruquet v. Briley*, 390 F.3d 505, 513 (7th Cir. 2004). "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). Although Cheeks raised a perjury claim to the state court, he agrees that he did not assert a claim in the state proceedings that the State knowingly used false testimony in his trial. As a result, he has procedurally defaulted his current claim.

Procedural default, however, does not create an absolute bar to habeas relief in federal court, and it does not implicate the jurisdiction of the federal court. *Lewis*, 390 F.3d at 1029; *Perruquet*, 390 F.3d at 514. Rather, procedural default is an affirmative defense. *Grigsby v. Cotton*, 456

F.3d 727, 731 (7th Cir. 2006); *Lewis*, 390 F.3d at 1020. "[T]he decision whether to assert an affirmative defense like procedural default lies with the Illinois Attorney General in the first instance . . . and in the ordinary course of events, her failure to raise the defense in a timely manner will result in a forfeiture*." See Perruquet*, 390 F.3d at 519. When the State forfeits the procedural default defense, "the decision whether to allow the State to interpose the defense somewhat belatedly [is] one committed to the district court's sound discretion." *Lewis*, 390 F.3d at 1029.

The district court noted in its disposition that it would not allow the State to belatedly assert a procedural default defense. *See Grigsby*, 456 F.3d at 731 (declining to enforce procedural default when untimeliness should have been clear to the State). We agree with Cheeks that at the least, the State forfeited a procedural default defense in this case by not timely asserting it before the district court. In defense of its failure to raise procedural default in its response to Cheeks's petition, the State explains that it assumed Cheeks's federal petition raised the same claim he had asserted in state court. But Cheeks had argued to the state court that Brown's testimony had been perjured, and in ruling against that claim, the Illinois Appellate Court specifically wrote that "Cheeks did not assert that the State knowingly used perjured testimony from Brown." In his federal habeas petition, Cheeks asserted that the "State knowingly used perjured testimony" to obtain his conviction, the same language the state court clearly stated Cheeks had not asserted to it. Moreover, the State's answer to Cheeks's habeas petition in the federal district court set forth

the proper federal constitutional standard for the claim
Cheeks raised in his habeas petition, which is a different
standard than for the perjury claim he pressed in the
state court. *See Shasteen*, 252 F.3d at 933. We will not
disturb the district court's determination that the proce-
dural default should not be enforced. *See also Torzala v.
United States*, 545 F.3d 517, 522 (7th Cir. 2008) (declining
to enforce procedural default when claim ultimately
had no merit); *Buggs v. United States*, 153 F.3d 439, 444
(7th Cir. 1998) (same).[1]

### C. No Effect on Murder Conviction

We have said that a conviction obtained by the
knowing use of false testimony should be set aside
if there is "'any reasonable likelihood that the false testi-
mony could have affected the judgment of the [fact-
finder].'" *Schaff v. Snyder*, 190 F.3d 513, 530 (7th Cir. 1999)
(quoting *Agurs*, 427 U.S. at 103). Cheeks contends that the
State knowingly used false testimony from Brown at trial

---

[1] We are mindful that 28 U.S.C. § 2254(b)(3) provides that "[a]
State shall not be deemed to have waived the exhaustion
requirement or be estopped from reliance upon the require-
ment unless the State, through counsel, expressly waives the
requirement." As we noted in *Perruquet*, there is a division of
authority as to whether section 2254(b)(3) applies to procedural
default as well as to exhaustion. *See Perruquet*, 390 F.3d at 515-16
(collecting cases). We declined to take a position on that
issue then and do not do so here as well. *See id.*; *cf.* 28 U.S.C.
§ 2254(b)(2).

about whether Cheeks was living at the Hickok Street dwelling on the night of Peterson's death, and that such testimony affected his murder and home invasion convictions. The State has several responses. It maintains that the statement in one of the letters, "if I had actually let someone know that you was living their [sic]," undercuts any suggestion that the State knew about any false testimony on Brown's part and that no evidence of the State's knowledge exists. It stresses that the state court has already examined the post-trial letters and conducted an additional hearing and rejected Cheeks's argument that they proved Brown's testimony was falsified. The State also emphasizes that the state appellate court concluded that the post-trial letters "would serve as evidence cumulative to the trial letters," suggesting there is not any reasonable likelihood that the result would have been different.

The State also asserts that we need not reach these arguments, though, if any false testimony regarding whether Cheeks resided at the home would not have affected his murder conviction. Cheeks received a sentence of thirty-five years' imprisonment for first-degree murder and a concurrent term of twenty years' imprisonment for home invasion. So, the State, contends, even if Brown's testimony would cause the home invasion conviction to fall, it had no effect on his murder conviction and no effect on his sentence since his terms were imposed concurrently.

Cheeks maintains that there is a reasonable likelihood that false testimony from Brown about whether Cheeks lived at the home could have affected his murder convic-

tion, not just his home invasion conviction. Under Illinois law, a home invasion conviction requires the government to prove that a person, without authority, entered "the dwelling place of another." 720 Ill. Comp. Stat. 5/12-11(a). In *Illinois v. Reid*, the Supreme Court of Illinois reasoned that the Illinois legislature had added the words "of another" to the statute and "thus specifically sought to exclude domestic disputes from the reach of the statute." 688 N.E.2d 1156, 1165 (Ill. 1997). The *Reid* court concluded that the defendant did not commit the offense of home invasion when he entered his own apartment, even though an order prohibited him from being there. *Id.* (After the decision in *Reid*, the Illinois legislature amended the statute. Now, the "dwelling place of another" for purposes of the home invasion statute "includes a dwelling place where the defendant maintains a tenancy interest but from which the defendant has been barred by a divorce decree, judgment for a dissolution of marriage, order of protection, or other court order." 720 Ill. Comp. Stat. 5/12-11(d). No court order barred Cheeks's presence at the Hickok Street residence.)

If Cheeks had been living at the Hickok Street residence on the night in question, he maintains that under *Reid* he would not be guilty of entering the dwelling place "of another." We will accept for the sake of argument Cheeks's contention that the post-trial letters suggest that Brown testified falsely at trial concerning whether Cheeks lived at the residence, and that this testimony could have affected his home invasion conviction. *See Illinois v. Delacruz*, 817 N.E.2d 191, 198-99 (Ill. App. Ct. 2004) (defendant did not enter dwelling place of another

where he resided at dwelling under informal arrange-
ment); *Illinois v. Taylor*, 742 N.E.2d 357, 365 (Ill. App. Ct.
2000) (defendant did not enter dwelling place of another
where he had permission to be in apartment on date in
question and had been staying there "a while")*. But see
Illinois v. Howard*, 870 N.E.2d 959 (Ill. App. Ct. 2007)
(stating that defendant cannot be convicted of home
invasion unless he has both a tenancy interest and a
possessory interest in the dwelling place, and that defen-
dant had no tenancy interest because he had no legal
title to the premises).

Cheeks agrees that whether any false testimony con-
cerning whether he lived at the residence could have
affected his first-degree murder conviction is a critical
question. We note that some confusion remains as to
whether Cheeks was convicted of one or three counts
of murder. A grand jury indicted Cheeks on three counts
of first-degree murder and two counts of home invasion.
One first-degree murder count asserted that Cheeks
violated 720 Ill. Comp. Stat. 5/9-1(a)(1), which applies
when a person performs acts causing death without
lawful justification, when "he either intends to kill or do
great bodily harm to that individual, or knows that
such acts will cause death to that individual or another."
The second first-degree murder count charged him
with violating 720 Ill. Comp. Stat. 5/9-1(a)(2), which
applies when the individual "knows that such acts create
a strong probability of death or great bodily harm to
that individual or another." The indictment also charged
Cheeks with first-degree murder for violating 720 Ill.
Comp. Stat. 5/9-1(a)(3), which applies when a person

causes death while attempting or committing a forcible felony. After the bench trial, the trial judge found Cheeks guilty on all "counts." The judgment, however, reflects a conviction only for one count of first-degree murder (along with the home invasion counts), for violating 720 Ill. Comp. Stat. 5/9-1(a)(1). So at the least, Cheeks stands convicted of first-degree murder under 720 Ill. Comp. Stat. 5/9-1(a)(1). This conviction did not have as an element the commission or attempted commission of a forcible felony.

Nonetheless, Cheeks maintains that his first-degree murder conviction for violating 720 Ill. Comp. Stat. 5/9-1(a)(1) was dependent upon the home invasion conviction and therefore dependent on false testimony Brown might have given concerning whether Cheeks resided at the home. His rationale begins with the Illinois self-defense statute, which provides that use of force in self-defense is not available to a person who "[is] attempting to commit, committing, or escaping after the commission of, a forcible felony." 720 Ill. Comp. Stat. 5/7-4(a). And home invasion is a forcible felony in Illinois. *Illinois v. Ramey*, 603 N.E.2d 519, 536 (Ill. 1992); *Illinois v. Graham*, 791 N.E.2d 724, 732 (Ill. App. Ct. 2003). Therefore, Cheeks argues, that the trial judge found he was committing home invasion rendered the defense of self-defense unavailable to him.

The problem for Cheeks is that committing a forcible felony is not the only way to lose a self-defense argument in Illinois, and it is not the way he lost it here. Self-defense is also not available in Illinois when the defendant

"initially provokes the use of such force against himself," unless (1) he reasonably believes he is in imminent danger of death or great bodily harm and has exhausted every other reasonable means of escape; or (2) he withdraws in good faith from the assailant, clearly indicating his desire to withdraw, and the assailant continues to use force. 720 Ill. Comp. Stat. 5/7-4(c).

The trial court transcripts, which were not in the record when the parties briefed and argued this case, reflect that the trial judge rejected Cheeks's self-defense argument not because he committed a forcible felony, but rather because he was the initial aggressor. The trial judge explained the rationale for its verdict after hearing all the evidence in the bench trial and stated explicitly: "you were the initial aggressor in all of this. So the self-defense is not available to you." The judge further elaborated that there was no evidence to sustain a self-defense theory, noting that only Cheeks was armed, that Cheeks had fought with Brown, and that he had threatened to kill her. The judge also said "the evidence has been uncontroverted [that] there was no aggressive manner by [Peterson]" and noted that Cheeks had said in a post-arrest statement that he believed Peterson had a weapon, but no other weapon was found in the area and there was no evidence that Peterson was ever armed with anything.

The transcripts make clear that the trial judge's conclusion that Cheeks had committed home invasion, which happens to be a forcible felony, had no impact on its decision to reject Cheeks's self-defense argument. Rather,

the judge declined to find self-defense because Cheeks was the initial aggressor and no exception applied. Therefore, whether Cheeks resided in the home had no impact on his first-degree murder conviction, and any false testimony regarding whether Cheeks lived in the home (the only false testimony suggested by the letters) had no reasonable likelihood of affecting that conviction.

Having reached this conclusion, we need not address his home invasion conviction. We briefly explain why for completeness. The "concurrent sentence doctrine," as it has been called, has been termed a discretionary bar to judicial review. *See Benton v. Maryland*, 395 U.S. 784, 787-91 (1969); *United States v. Kimberlin*, 675 F.2d 866, 867 (7th Cir. 1982). It allows appellate courts to decline to review a conviction carrying a concurrent sentence when one "concurrent" conviction has been found valid. *Kimberlin*, 675 F.2d at 867. We have said that "[t]he proper exercise of this discretion depends on the degree of prejudice that may be attributed to the challenged conviction." *Cramer v. Fahner*, 683 F.2d 1376, 1380 (7th Cir. 1982).

The concurrent sentence doctrine would not apply if Cheeks had been convicted in federal court. For federal convictions, 18 U.S.C. § 3013 mandates a separate monetary assessment for each count of conviction, and these separate assessments preclude the use of the concurrent sentence doctrine. *See Ray v. United States*, 481 U.S. 736, 737 (1987) (per curiam); *United States v. Spirk*, 503 F.3d 619, 622 (7th Cir. 2007). Cheeks, though, was convicted in Illinois state court, and the state court did not

impose a monetary assessment or fine for any of his convictions in this case.

Cheeks does not contest the State's position that his home invasion conviction carries with it no additional consequences beyond those accompanying his murder conviction. Cheeks's sentence was not affected, as the judge sentenced him to a term of 35 years for murder to be served concurrently to the 20-year home invasion term, and the court made it clear it had decided to sentence above the statutory minimum for murder for factors unrelated to home invasion, including Cheeks's criminal history. *See United States v. Alanis*, 265 F.3d 576, 590 (7th Cir. 2001) (no prejudice when defendant received concurrent sentence and only one count of conviction was improper); *cf. United States v. Shah*, 559 F.3d 643, 645 (7th Cir. 2009) (remanding for resentencing on direct appeal to allow defendant to argue for lighter sentence in light of reversal on one count). In addition, Illinois no longer has parole, so the home invasion conviction would not affect that determination. Cheeks also does not dispute the State's assertion that his home invasion conviction would not affect his term of mandatory supervised release, as the term is the same for first-degree murder and home invasion convictions and is not increased by the home invasion conviction. *See* 730 Ill. Comp. Stat. 5/5-8-1(d); 720 Ill. Comp. Stat. 5/12-11(c). The home invasion conviction also would not affect the determination of whether Cheeks was a habitual offender because convictions connected with the same transaction are considered one for purposes of that provision. *See* 720 Ill. Comp. Stat. 5/33B-1(c). Nor does Cheeks challenge

the propriety of the concurrent sentence doctrine itself. *Cf. Borre v. United States*, 940 F.2d 215, 223 n.16 (7th Cir. 1991).

So Cheeks offers us no other reason to review his convictions. A lack of collateral consequences can mean that the Article III case-or-controversy requirement has not been satisfied. Forty years ago, the Supreme Court said in *Benton v. Maryland*, 395 U.S. 784 (1969), that the existence of a concurrent sentence did not make a habeas petition moot. Instead, a court could presume collateral consequences from criminal convictions, thereby leaving application of the concurrent sentence doctrine a matter of the court's discretion. *Id.* at 790-91. More recently, however, the Court has criticized earlier collateral-consequence jurisprudence, finding that presuming such consequences "sits uncomfortably" beside the principles that standing must appear in the record, and that the burden is on the party seeking the favorable exercise of jurisdiction to demonstrate that jurisdiction is present. *See Spencer v. Kemna*, 523 U.S. 1, 9-14 (1998) (finding insufficient collateral consequences to satisfy Article III's injury-in-fact requirement after petitioner completed term of imprisonment resulting from parole revocation). *Spencer* also said that any interest in vindicating one's reputation from a finding that he had committed a serious felony is not enough to avoid mootness. *Id.* at 16 n.8; *cf. Ball v. United States,* 470 U.S. 856, 864-65 (1985) (stating pre-*Spencer* that second conviction had potential consequences even if it resulted in no greater sentence, including harm to reputation).

In this case, it is enough to say that testimony Brown gave about whether Cheeks was living with her did not affect Cheeks's murder conviction and that no other actual or potential consequence has been identified. Moreover, although the State did not assert the concurrent sentence doctrine in response to Cheeks's one-sentence petition for a writ of habeas corpus, the parties briefed and argued the legal question of whether any false testimony suggested by the letters had a reasonable likelihood of affecting the murder conviction (and the doctrine has been described as one of judicial discretion, *Benton*, 395 U.S. at 791, not as an affirmative defense subject to forfeiture). *See Jones v. Hulick*, 449 F.3d 784, 787 (7th Cir. 2006). Therefore, we do not think that "law and justice" requires further proceedings in this habeas case where Cheeks has not pointed us to any potential benefit from doing so. *See Barnes v. United States*, 412 U.S. 837, 848 & n.16 (1973) (declining as discretionary matter to reach propriety of other convictions where defendant serving concurrent sentence); *cf. Cabrera v. Hinsley*, 324 F.3d 527, 532-33 (7th Cir. 2003) (questioning need to review additional conviction served under concurrent sentence). We affirm the district court's denial of Cheeks's petition for a writ of habeas corpus.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.

7-7-09